## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

RICHARD MCCALL, individually and on behalf of all others similarly situated,

Plaintiffs,

v.

AMAZON.COM SERVICES LLC,

Defendant.

Civil Action No.:

**CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiff Richard McCall ("Plaintiff"), by and through his attorneys, makes the following allegations pursuant to the investigation of his counsel and based upon information and belief, except as to allegations specifically pertaining to himself and his counsel, which are based on personal knowledge, against Defendant Amazon.com Services LLC ("Amazon" or "Defendant").

## NATURE OF THE ACTION

1.      Plaintiff brings this action for damages and other legal and equitable remedies resulting from the illegal actions of Defendant in collecting, retaining, storing, using, and profiting from his and other similarly situated individuals' biometric identifiers information[1] (referred to at times as "biometrics") – their hand geometry ("hand geometry" or "palm scans" or "palm prints") – without properly disclosing or notifying Plaintiff and Class Members in direct violation of the New York City Biometric Identifier Information Law ("NYC BIIL" or "BIIL"), New York City, N.Y., Code § 22-1201, *et seq.*

---

[1] "The Term 'biometric identifier information' means a physiological or biological characteristic that is used by or on behalf of a commercial establishment, singly or in combination, to identify, or assist in identifying, an individual, including, but not limited to: (i) a retina or iris scan, (ii) a fingerprint or voiceprint, (iii) a scan of hand or face geometry, or any other identifying characteristic." New York City, N.Y., Code § 22-1201

2.     The New York City Council has found that "[d]evelopments in facial recognition and other biometric technology pose new consumer protection challenges in an atmosphere where there are already growing concerns about privacy and personal data."[2]  The City Council passed the NYC BIIL in response to these challenges, which include, *inter alia*, the technological limitations, privacy-related issues, and cyber security hazards associated with the collection and use of biometrics.[3]  Turning to the first of these, technological limitations, the City Council has remarked extensively on how the use of biometric technology raises "significant concerns about accuracy, especially for women, children, African Americans, and Asians for whom . . . algorithms are known to be less accurate."[4]  The Council noted that "AI systems learn what they are taught. If they are not taught with robust and diverse data sets, accuracy and fairness could be at risk[]"[5] because "systems that are trained within only a narrow context of a specific data set will inevitably acquire bias that skews its learning towards the specific characteristics of that data set."[6]  The BIIL evinces the City Council's recognition of how "[s]uch errors can be particularly damaging for individuals[,]" including those "who are mistakenly entered into a criminal database, for example,

---

[2] https://legistar.council.nyc.gov/LegislationDetail.aspx?ID=3704369&GUID=070402C0-43F0-47AE-AA6E-DEF06CDF702A&Options=ID%7cText%7c&Search=, Hearing Transcript 12/10/20, p. 4-5.

[3] https://legistar.council.nyc.gov/View.ashx?M=F&ID=9004887&GUID=B0996283-26E6-4083-ACFC-830AE3AED308, Committee Report 12/10/20, p. 9, 12, 13.

[4] https://legistar.council.nyc.gov/View.ashx?M=F&ID=7761013&GUID=CAC07AB4-200A-46FC-8F2D-4D0B72E9D9E2, Committee Report 10/7/19, p. 7.

[5] *Id.* at p. 8.

[6] *Id.*

of supposed shoplifters."[7]  One such error that the City Council found to be instructive was "the alleged case for student Ousmane Bah," who claimed "his name was mistakenly linked to the face of a thief who stole products from an Apple store.  The flawed facial recognition hit resulted in the NYPD arriving at Bah's home to arrest him for crimes he had no part in."[8]

3.     While working on the BIIL, the City Council also expressed apprehension about the privacy-related issues that have accompanied the advent of biometric technology.  Namely, the Council wrote and spoke at length about how, in "New York City, as well as many other municipalities, establishments frequently do not inform customers"[9] that biometric technology is being utilized and "companies developing this type of software sometimes resort to shady or deceitful tactics to expand their databases or improve their product."[10]  Of particular note to the City was how, "in Atlanta, Google was hiring contractors to deliberately target people of color encouraging them to scan their faces in exchange for a $5.00 gift card so that they could improve its new pixel device."[11]  The Council was also distressed at how companies have been known to

---

[7] https://legistar.council.nyc.gov/View.ashx?M=F&ID=9168703&GUID=A11149B9-F476-462B-B902-95153CEDC7D2, Minutes of the Stated Meeting – December 10, 2020, p. 2482.

[8] *Id.*

[9] https://legistar.council.nyc.gov/View.ashx?M=F&ID=9004887&GUID=B0996283-26E6-4083-ACFC-830AE3AED308, Committee Report 12/10/20, p. 14.

[10] https://legistar.council.nyc.gov/View.ashx?M=F&ID=7786279&GUID=16F7F4CE-9E1B-4629-A11F-232A2BCC31DF, Hearing Transcript 10/7/19, p. 10.

[11] *Id.*

"conceal the fact that people's faces were being recorded and even lie to maximize their data collections[]"[12] and noted that "[t]hese kinds of deceptive practices are simply not acceptable."[13]

4.      Likewise, the City Council sought to address how individuals' biometrics often come to be stored in "numerous private and public databases of information, which may be sold, shared, or used in ways that the consumer does not necessarily understand or consent to."[14]  The legislative history of the BIIL mentions how "data from consumer-based surveillance software such as Ring (which uses cameras to monitor a person's doorbell and/or entryway), is also being shared with law enforcement[,]"[15] and how "[g]overnment agencies have [] been accused of mining personal biometric data[]" such as when "Immigration and Customs Enforcement ('ICE') used facial recognition software to mine state driver's license databases."[16]

5.      More generally, the BIIL regulates the usage of biometrics to turn a profit.  The City Council was concerned about how "[i]nformation on customers, their behaviors and their purchasing histories can be valuable, and there have been numerous incidents of companies collecting this information and either selling it to, or having it harvested by third parties, without the knowledge or consent of consumers."[17]  Leading up to the passage of the BIIL, the City Council explored how "Cambridge Analytica had harvested information from 50 million Facebook profiles

---

[12] *Id.* at p. 10-11.

[13] *Id.* at 11.

[14] https://legistar.council.nyc.gov/View.ashx?M=F&ID=7761013&GUID=CAC07AB4-200A-46FC-8F2D-4D0B72E9D9E2, Committee Report 10/7/19, p. 9.

[15] *Id.* at p. 14.

[16]  *Id.* at p. 13-14.

[17] https://legistar.council.nyc.gov/View.ashx?M=F&ID=9004887&GUID=B0996283-26E6-4083-ACFC-830AE3AED308, Committee Report 12/10/20, p. 14.

to gather data on voters for its clients involved in the pro-Brexit campaign and Donald Trump's election[,]"[18] how "consumers of the photo storage application Ever, found their images were being used without their explicit consent. . . . [and] the company then used these photos to develop their own facial recognition software, which they then sold to law enforcement, the military and private companies[,]"[19] and how, in "Illinois, where legislation mandates that companies inform customers that there is facial recognition technology in use and obtain customers' consent before it can be used on them, a class action lawsuit is being brought against Macy's department stores."[20] The BIIL reflects the New York City Council's disapproval of the ways in which companies, such as those mentioned herein, have allegedly been "'actively profiting' off information gleaned from the biometric data" such as by parlaying individuals' biometrics into "improved security and marketing"[21] and other functions that serve to advance companies' respective ends.

6.      Relatedly, the Council remarked on the ways in which biometrics may be paired with "multiple tracking technologies" to "manipulate the availability, cost, and appeal of an item."[22]  It noted that companies already draw upon "customer information to determine the ideal cost at which a shopper will purchase a particular product"[23] by using, *inter alia*, "the data obtained

---

[18] *Id.*

[19] *Id.*

[20] *Id.*

[21] https://legistar.council.nyc.gov/View.ashx?M=F&ID=9168703&GUID=A11149B9-F476-462B-B902-95153CEDC7D2, Minutes of the Stated Meeting - December 10, 2020, p. 2484.

[22] https://legistar.council.nyc.gov/View.ashx?M=F&ID=7761013&GUID=CAC07AB4-200A-46FC-8F2D-4D0B72E9D9E2, Committee Report 10/7/19, p. 17.

[23] *Id.*

by social media platforms, such as shoppers' e-mail addresses and other personal information."[24] This information is voluminous and "enables retailers 'to develop a broad picture about a consumer, such as identifying that the individual owns a house, runs marathons, eats healthy food, has a premium bank card, and is good in financial health.'"[25] The BIIL marks the City's trepidation about how "[c]onnecting such data to a customers' faceprint [or other biometrics] would allow retailers to inflate the price of a product to consumers in the store willing and able to pay more, while offering the same product to other consumers for less money."[26] The City found it especially egregious that "this information[ is] mostly collected without consumers' knowledge or consent[.]"[27]

7.     Finally, the BIIL was enacted as a means of confronting the problem that "[b]iometric data is often collected and stored in large databases that, if not properly protected, are susceptible to hacking."[28] The Law's legislative history notes that, "[t]hese databases will likely be exposed to security failures and breaches, information leaks by careless or corrupt employees, hackers, or even foreign intelligence agency break-ins."[29] The Council was especially perturbed by how "researchers discovered a severe vulnerability in the biometric databases of a company called Suprema, which contained the fingerprints of over one million people, as well as facial

---

[24] *Id.* at p. 18.

[25] *Id.*

[26] *Id.*

[27] *Id.*

[28] https://legistar.council.nyc.gov/View.ashx?M=F&ID=9168703&GUID=A11149B9-F476-462B-B902-95153CEDC7D2, Minutes of the Stated Meeting - December 10, 2020, p. 2483.

[29] https://legistar.council.nyc.gov/View.ashx?M=F&ID=7761013&GUID=CAC07AB4-200A-46FC-8F2D-4D0B72E9D9E2, Committee Report 10/7/19, p. 9.

recognition information, unencrypted usernames and passwords, and personal information of employees of various clients of the company."[30]

8.    The BIIL seeks to prevent incidents like this, which, the City noted, "could result in grave consequences for those affected[]"[31] because "[b]iometric information is based on a unique physiological characteristic making it naturally stable and hard to artificially alter."[32]   That is, the BIIL embodies the notions that "[b]iometric information is part of a person's identity." [33]   "Unlike a password, this information cannot be changed." [34]   "When cybercriminals access biometric data — fingerprints, retina, facial, or voice — they gain information that can be linked to the identity forever." [35]   "The potential damage is irreversible, creating a constant fear of information or identity theft." [36]

9.    The Council noted that:

> Alarmingly, stolen biometric identifiers could be used to impersonate consumers, gaining access to personal information and buildings. The use of biometrics for accessing sensitive personal information creates an increased risk of tangible and substantial harm when such information is stolen. The privacy risks of data breaches may also lead to potential future harm even when stolen consumer data is not yet targeted to directly harm the consumer. The

---

[30] https://legistar.council.nyc.gov/View.ashx?M=F&ID=9168703&GUID=A11149B9-F476-462B-B902-95153CEDC7D2, Minutes of the Stated Meeting - December 10, 2020, p. 2483.

[31] https://legistar.council.nyc.gov/View.ashx?M=F&ID=7786279&GUID=16F7F4CE-9E1B-4629-A11F-232A2BCC31DF, Hearing Transcript 10/7/19, p. 7.

[32] https://legistar.council.nyc.gov/View.ashx?M=F&ID=7761013&GUID=CAC07AB4-200A-46FC-8F2D-4D0B72E9D9E2, Committee Report 10/7/19, p. 9.

[33] *Id.*

[34] *Id.*

[35] *Id.*

[36] *Id.*

> heightened alert following a data breach creates uncertain[ty] and a
> form of lost opportunities as individuals take actions to mitigate
> against and reduce any potential harms or transactional losses.
> Although some argue that it is possible to overcome the problem of
> information leaks or hacks through appropriate security measures,
> recent sensitive data leaks, numbering hundreds of thousands of
> military, business, politician and public figures— suggests that
> nothing is safe."[37]

10.    In recognition of these and other concerns related to the collection and use of
individuals' biometrics, the New York City Council enacted NYC BIIL, which provides, *inter
alia*, that any "commercial establishment that collects, retains, converts, stores or shares biometric
identifier information of customers must disclose such collection, retention, conversion, storage or
sharing, as applicable, by placing a clear and conspicuous sign near all of the commercial
establishment's customer entrances notifying customers in plain, simple language, in a form and
manner prescribed by the commissioner of consumer and worker protection by rule, that
customers' biometric identifier information is being collected, retained, converted, stored or
shared, as applicable."  New York City, N.Y., Code § 22-1202(a).

11.    The "rule" referenced therein is the Department of Consumer Protection's rule to
implement Local Law 3 of 2021,[38] which states:

> To comply with section 22-1202 of chapter 12 of title 22 of the New
> York City Administrative Code, a commercial establishment
> covered by such section must post a sign in a clear and conspicuous
> manner at every entrance used by customers in a size of at least 8.5
> inches by 11 inches that discloses if customers' biometric identifier
> information is being collected, retained, converted, stored, or
> shared. The requirements of this section may be fulfilled by posting
> a color copy of the Biometric Identifier Information Disclosure, as
> made publicly available on the Department's website, in a clear and

---

[37] *Id.* at p. 12.

[38] https://rules.cityofnewyork.us/rule/biometric-identifier-information/.

conspicuous manner at every entrance used by customers in a size of at least 8.5 inches by 11 inches.[39]

12.     The "sign" mentioned by the Department of Consumer Protection's rule is called the "Biometric Identifier Information Disclosure" sign, and it has been made available at https://www1.nyc.gov/assets/dca/downloads/pdf/businesses/Biometric-Identifier-Information-Disclosure-Sign.pdf.

13.     The BIIL further states that "[i]t shall be unlawful to sell, lease, trade, share in exchange for anything of value or otherwise profit from the transaction of biometric identifier information."  New York City, N.Y., Code § 22-1202(b).  The bill provides for a private right of action that allows for judgments of $500 for each violation of section 22-1202 and $5,000 for the intentional or reckless violations of section 22-1202(b).  *Id.* § 22-1203.

14.     In direct violation of each of the foregoing provisions of the NYC BIIL, Defendant: collected, retains, converted, stored, and/or shared – without first placing clear and conspicuous signs near all of its commercial establishments' customer entrances – the biometrics (scans of hand geometry) and associated personally identifying information of hundreds or thousands of its customers, who have scanned their palmprints using Defendant's Amazon One technology in New York City, including at Amazon Go, Starbucks with Amazon Go, and Whole Foods locations.

15.     Defendant has also profited from these transactions involving the biometric identifier information of class members.

16.     Defendant has been engaged in the practice of directing customers of retail locations to make purchases using their palm prints in New York City since at least May 2019.

---

[39] https://rules.cityofnewyork.us/wp-content/uploads/2021/07/NOA_DCWP-Rule-re-Biometric-Data-Collection.pdf.

17.     If Defendant's database of digitized palm prints were to fall into the wrong hands, by data breach or otherwise, the customers to whom these sensitive and immutable biometric identifiers belong could have their identities stolen, among other serious issues.

18.     NYC BIIL confers on Plaintiff and all other similarly situated New York City residents a right to know of such risks, which are inherently presented by the collection, storage, use of biometrics.

19.     Plaintiff brings this action to prevent Defendant from further violating the privacy rights of New York City residents and to recover statutory damages for Defendant's having used and profited from individuals' biometrics in violation of NYC BIIL.

## JURISDICTION AND VENUE

20.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because there are more than 100 class members and the aggregate amount in controversy exceeds $5,000,000.00, exclusive of interest, fees, and costs, and at least one Class member is a citizen of a state different from Defendant.

21.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because a substantial portion of the events that gave rise to this cause of action occurred here.

22.     This court has personal jurisdiction over Defendant because a substantial portion of the events that gave rise to this cause of action occurred here.

## PARTIES

23.     Plaintiff Richard McCall is a citizen and resident of Brooklyn, New York.  In or around January 2023, Plaintiff McCall visited an Amazon Go store located in Manhattan, New York and made a purchase using his palm print as directed by Defendant.

24.     Defendant Amazon.com Services LLC is a Delaware limited liability company

with its principal place of business in Seattle, Washington.  Defendant owns and operates retail locations throughout New York.

## FACTUAL BACKGROUND

**I.    The New York City Biometric Identifier Information Law.**

25.    The use of a biometric scanning system in commercial establishments entails serious risks. Unlike payment cards—which can be changed or replaced if stolen or compromised—fingerprints and palmprints are permanent, unique biometric identifiers associated with particular consumers. This exposes consumers to serious and irreversible privacy risks. For example, if a device or database containing employees' palmprints data is hacked, breached, or otherwise exposed, consumers have no means by which to prevent identity theft and unauthorized tracking.

26.    Recognizing the need to protect citizens from these risks, New York City enacted the Biometric Identifier Information law, New York City, N.Y., Code § 22-1201, *et seq*. ("NYC BII") in 2021, to regulate companies that collect and store biometric information. *See* New York City Council Committee on Consumer Affairs and Business Licensing, Transcript December 10, 2020.

27.    NYC BIIL makes it unlawful for a company to, inter alia, "sell, lease, trade, share in exchange for anything of value or otherwise profit from the transaction of biometric identifier information."  New York City, N.Y., Code § 22-1202(b).

28.    As alleged below, Defendant's practices of (1) collecting, retaining, converting, storing, and/or sharing biometric identifier information (specifically, palmprints) without having first placing clear and conspicuous signs near all of its commercial establishments' customer

entrances, and (2) otherwise profiting from the transaction of biometric identifier information violated NYC BIIL.

## II.    Defendant Violates The New York City Biometric Identifier Information Law.

29.    In direct violation of NYC BIIL, Defendant has collected, retained, converted, stored, and/or shared the biometric identifier information – the palmprints – of all individuals who have, since at least May 2019, scanned their palmprints using Defendant's Amazon One technology in New York City, including at Amazon Go, Starbucks with Amazon Go, and Whole Foods locations.

30.    In direct violation of 22-1202(b) of NYC BIIL, from at least May 2019, Defendant has profited from transactions of the class's biometric identifier information. Amazon does this in several ways, including, but not limited to, the following.

31.    <u>First</u>, Amazon utilizes individuals' biometrics to expand their databases and/or improve their products/services.  In the "Data & Privacy" section of the Amazon One website's "Help" page, Amazon states, in response to the question "What does Amazon do with my palm data?" that "Palm data you provide to Amazon One . . . is used to improve our system."[40]  Notably, "biometric system[s] for identification or recognition" often make use of "machine learning algorithm[s,]" which are "[a]t the core of artificial intelligence[.]"[41]  A machine learning "algorithm uses . . . data to identify patterns and predict an answer to a question, such as 'what parts of this face are important when figuring out who this person is?'"[42] – essentially making

---

[40] https://one.amazon.com/help.

[41] https://www.intechopen.com/chapters/62526.

[42] https://www.gao.gov/assets/710/708201.pdf.

"[m]achine learning [] a procedure to learn from examples[.]"[43]  ID R&D, a leader in the field of biometrics, explains that such machine learning procedures require "data [] divided into a training and test set… training data is used to train the [algorithm], and the test set contains unseen or out-of-domain images used to evaluate the [algorithm]."[44]  "Training most machine learning (ML) models often requires over tens of thousands of training samples" and "[w]hen the amount of training data is small, an ML model does not generalize well[,] . . . creating a system that memorizes every training input."[45] Machine learning systems can also suffer from issues when their data sets' "diversity and distribution don't represent the real world[;] [i]f your training data already has a thousand photos of a white cat, adding a thousand more photos of the same white cat is unlikely to improve results." [46] Accordingly, collecting "[b]ig data is paramount" [47] to the success of a biometric system and "significant value can be gained by improving the data sets used to train the machine learning algorithms."[48]  However, big "data can be messy, plagued with bias and expensive to collect[]"[49] ("training [] a cutting-edge AI algorithm costs several million

[43] https://www.intechopen.com/chapters/62526.

[44] https://www.idrnd.ai/how-does-ai-training-work/.

[45] https://purple.telstra.com/blog/investigating-ml-model-accuracy-as-training-size-increases.

[46] https://www.hpe.com/us/en/insights/articles/when-training-ai-models-is-a-bigger-dataset-better-2207.html.

[47] *Id.*

[48] https://www.perkinscoie.com/en/news-insights/Understanding-the-Data-Privacy-Risks-With-AI-Driven-ARVR-Applications.html.

[49] https://www.politico.eu/newsletter/ai-decoded/chinas-deepfake-law-synthetic-data-selling-sensitive-data-for-profit-2/.

dollars[]"[50]) and "it can waste time, power, and money if there is nothing new to learn in the data, making the model more expensive and slower to build than it should be."[51]  Thus, each time that a user transacts or exchanges their biometrics with Amazon, by way of Amazon One ("transaction of biometrics with Amazon, by way of Amazon One" or "TBAO"), Amazon receives a profit – the valuable return of data used to train and/or otherwise improve its system.  Such transactions of biometrics help Amazon to overcome each of the foregoing challenges with machine learning-/artificial intelligence-based biometrics systems (i.e., lack of data set size, diversity, etc.) and therefore increase the value of Amazon's biometrics system(s).

32.    Second, Amazon utilizes TBAOs to galvanize said individuals to create and/or utilize Amazon accounts.  When someone signs up for Amazon One, they create a "unique Amazon One ID" that consists of a "scan [of] one or both . . . palms, . . . [a] mobile phone number and  . . . a credit card and/or merchant membership number."[52]  At an Amazon One machine, Amazon first requests that they insert a credit or debit cad which will be used when they pay with Amazon One.  Then, users are asked to center their palm over the Amazon one scanner so that Amazon One may recognize them thereafter.  Once or both hands are scanned, users proceed to enter their mobile phone number.

33.    With this Amazon One ID, users are presented with three options: (a) linking the Amazon One ID that they create in-store to an Amazon account of their choice, via an email automatically sent to them if the "card you enroll with is already associated with an Amazon

---

[50] https://www.wired.com/story/ai-smarts-big-price-tag/.

[51] https://www.hpe.com/us/en/insights/articles/when-training-ai-models-is-a-bigger-dataset-better-2207.html.

[52] https://one.amazon.com/help.

account[]";[53]  (b) linking their Amazon One ID to an Amazon account online (if their Amazon One ID card is not already associated with an Amazon account) by navigating to https://one.amazon.com/signin, signing in with (or creating new) "Amazon account information and follow[ing] instructions to link [an] Amazon account to [an] Amazon One profile[]";[54] or (c) maintaining only an Amazon One ID (unlinked to a general Amazon account), in which case they may view the receipts from their in-store purchases at https://www.amazon.com/receipts and request to cancel their Amazon One ID at https://one.amazon.com/data-deletion-request/verification.

34.    In each of these cases, Amazon profits from TBAOs.  First, because Amazon One IDs are managed online, through general Amazon accounts and/or Amazon website(s), TBAOs help Amazon to acquire new customers for its other services (i.e., those who make Amazon One IDs and choose to link said IDs with Amazon accounts that they freshly create).  Second, TBAOs facilitate contact with existing Amazon customers, increasing the chances that they will utilize their Amazon accounts (i.e., after signing in, online, to manage their Amazon One ID, or otherwise) to shop, avail themselves of services, and engage in other activities that make Amazon money.

35.    Third, in the same vein, TBAOs confer not only biometric data to Amazon, but also *automatically link* individuals' biometrics with other intrinsically valuable forms of information – namely, their phone numbers, credit or debit card numbers, and in-store activities (i.e., purchase history, returns, etc., as demonstrated by the aforementioned Amazon One receipts page, https://www.amazon.com/receipts).  Amazon's collection of this data furnishes it with valuable

---

[53] *Id.*

[54] https://one.amazon.com/getting-started.

business opportunities, including to communicate with Amazon One users and learn more about Amazon One users' in-store shopping habits.

36.    Fourth, Amazon One is one of Amazon's Just Walk Out technologies, and, according to Amazon, it works well in retail settings where "shoppers expect convenience, and retailers don't want to lose a sale because a shopper sees a line and decides not to wait[]" – places where shoppers want to "get in, get out, and go[.]"[55]  Similarly, Amazon states that "Amazon One enhances the shopper experience and reduces friction from the moment the shopper enters the store."[56]  In the New York City locations in which Amazon has deployed Amazon One, therefore, Amazon profits through TBAOs because TBAOs, based on Amazon's very own admissions, increase the likelihood that customers will consummate purchases more frequently and/or of more items/services.

37.    Fifth, Amazon profits from TBAOs because Amazon treats TBAOs as a product/service to *sell* to other businesses.  Prominently displayed on the website for Amazon One, one.amazon.com, Amazon advertises:  "Bring Amazon One to your business. If you're a business that wants to provide your customers a seamless service, faster payments, and a personalized experience - contact us to learn more about how Amazon One can help."[57]  Businesses are encouraged to click on the "contact us" words therein, which hyperlink to the email address AmazonOneSales@amazon.com.  On the page, mentioned *supra*, describing its "Just Walk Out" technology, Amazon also advertises that, "[w]ith Just Walk Out technology and Amazon One–

---

[55] https://aws.amazon.com/blogs/industries/make-convenience-stores-even-more-convenient-with-amazons-just-walk-out-technology-and-amazon-one/.

[56] https://aws.amazon.com/blogs/industries/make-convenience-stores-even-more-convenient-with-amazons-just-walk-out-technology-and-amazon-one/.

[57] https://one.amazon.com/.

enabled stores, employees can spend more time assisting shoppers, answering questions, helping them find items, and stocking shelves as needed, rather than operating checkouts and manually processing payments."[58]  Otherwise, Amazon advertises that companies can use Just Walk Out: (a) "Analytics to create more productive planograms through improved selection and to set profitable promotions to build bigger baskets[,]"[59] (b) to "improve efficiency by scheduling staff where you need them most, and refine production and inventory levels to shrink waste[,]"[60] (c) to "[g] ain new insights across the store and at the shelf using Just Walk Out Analytics information about how products are considered and purchased[,]"[61] (d) to "[i]ncrease sales per square foot with scalable, flexible technology[,]"[62] (e) to "[i]mprove labor efficiency and schedule staff more effectively[,]"[63] (f) to "[g]ain consumer loyalty by offering a fast, convenient way to shop[,]" and (g) to "[o]perate with confidence by relying on the security, reliability, and technical support of Amazon."[64]

  38. Currently, the list of Amazon One locations promulgated by Amazon[65] shows that Amazon One technology is primarily utilized, at present, in Amazon's own brick-and-mortar

---

[58] https://aws.amazon.com/blogs/industries/make-convenience-stores-even-more-convenient-with-amazons-just-walk-out-technology-and-amazon-one/.

[59] https://aws.amazon.com/just-walk-out/.

[60] *Id.*

[61] *Id.*

[62] *Id.*

[63] *Id.*

[64] *Id.*

[65] https://one.amazon.com/.

locations – including, but not limited to, Amazon Go convenience stores, Amazon Campus Cafes, Amazon Fresh grocery stores, Amazon Style clothing stores, and at Whole Foods. However, the list also reveals that Amazon has already implemented Amazon One in third-parties' locations, including in New York City, at the 111 East 59th Street Amazon Go location, which is a Starbucks with Amazon Go.[66] Likewise, Amazon One has been rolled out to arenas[67] and other sites not owned by Amazon (i.e., casinos, airports, etc.).[68]

39.    Given the foregoing, Amazon has profited from Class Members' TBAOs by (a) utilizing these TBAOs as an advertising tool and proof-of concept for a product/service (Amazon One) that it holds out to other companies; (b) utilizing TBAOs to compile a database of biometric and other personal data that it markets/sells/leases/shares/otherwise purveys/offers to purvey to other companies (especially given its analytics, security/reliability, and convenience-enhancing capabilities) in exchange for money/things of value; and (c) facilitating TBAOs in the 111 East 59th Street Starbucks with Amazon Go location and receiving, in exchange, consideration from Starbucks for doing so.

## III.    Experience of Plaintiff Richard McCall.

40.    In or around January 2023, Plaintiff McCall visited an Amazon Go store located in Manhattan, New York and made a purchase as directed by Defendant.

---

[66] https://www.starbucks.com/store-locator/store/1032137/59th-park-lex-w-amazon-go-111-east-59th-st-space-1-new-york-ny-10022-us.

[67] https://www.theverge.com/2021/9/14/22673238/amazon-one-palm-scanning-tech-entertainment-venue-red-rock-amphitheatre.

[68] https://one.amazon.com/.

41.    During the course of this transaction, Defendant required Plaintiff to place his palm over an Amazon One palm scanner, at which point Defendant collected, retained, converted, stored, and/or shared Plaintiff's palmprint biometric identifier information.

42.    Defendant never disclosed to Plaintiff McCall, through clear and conspicuous signage near all of the Amazon Go location's customer entrances, that it collects, retains, converts, stores or shares biometric identifier information, including that of Plaintiff McCall.

43.    Defendant profited from the transaction of Plaintiff McCall's transaction of biometric identifier information by way of Amazon One ("TBAO") because Defendant utilized Plaintiff McCall's TBAO to (1) expand their database and/or improve their products/services; (2) galvanize individuals to create and/or utilize Amazon accounts; (3) automatically link individuals' biometrics with other forms of personal information (phone numbers, credit/debit cards, and purchase history) and gathering data therefrom; (4) increase the likelihood that. and frequency with which, customers consummate purchases; (5) hold out their database of biometrics/Amazon One as a product/service to other companies.

44.    Thus, Defendant invaded Plaintiff's statutorily protected right to privacy in his biometrics.

## CLASS ALLEGATIONS

45.    **Class Definition:** Plaintiff brings this action pursuant to New York City, N.Y., Code § 22-1201, *et seq*. on behalf of a class of similarly situated individuals, defined as follows (the "Class"):

> All individuals who had their fingerprints collected, captured, received or otherwise obtained and/or stored by Defendant in the course of a transaction that occurred in New York City.

46.    **Numerosity:** The number of persons within the Class is substantial, believed to amount to thousands of persons. It is, therefore, impractical to join each member of the Class as a named Plaintiff.  Further, the size and relatively modest value of the claims of the individual members of the Class renders joinder impractical.  Accordingly, utilization of the class action mechanism is the most economically feasible means of determining and adjudicating the merits of this litigation.  Moreover, the Class is ascertainable and identifiable from Defendant's records.

47.    **Commonality and Predominance:** There are well-defined common questions of fact and law that exist as to all members of the Class and that predominate over any questions affecting only individual members of the Class.  These common legal and factual questions, which do not vary from Class member to Class member, and which may be determined without reference to the individual circumstances of any class member, include, but are not limited to, the following:

(a) whether Defendant collected, retained, converted, stored and/or shared Plaintiff's and the Class' biometric identifier information;

(b) whether Defendant placed a clear and conspicuous sign near all of the commercial establishment's customer entrances notifying customers in plain, simple language, in a form and manner prescribed by the commissioner of consumer and worker protection by rule, that Plaintiff's and the Class' biometric identifier information was being collected, retained, converted, stored or shared;

(c) whether Defendant sold, leased, traded, shared in exchange for anything of value, or otherwise profited from the transaction of Plaintiff's and the Class' biometric identifier information.

48.    **Adequate Representation:** Plaintiff has retained and is represented by qualified and competent counsel who are highly experienced in complex consumer class action litigation. Plaintiff and his counsel are committed to vigorously prosecuting this class action.  Moreover, Plaintiff is able to fairly and adequately represent and protect the interests of such a Class.  Neither Plaintiff nor his counsel has any interest adverse to, or in conflict with, the interests of the absent

members of the Class.  Plaintiff has raised viable statutory claims or the type reasonably expected to be raised by members of the Class, and will vigorously pursue those claims.  If necessary, Plaintiff may seek leave of this Court to amend this Class Action Complaint to include additional Class representatives to represent the Class, additional claims as may be appropriate, or to amend the Class definition to address any steps that Defendant took.

49.    **Superiority:** A class action is superior to other available methods for the fair and efficient adjudication of this controversy because individual litigation of the claims of all Class members is impracticable.  Even if every member of the Class could afford to pursue individual litigation, the Court system could not.  It would be unduly burdensome to the courts in which individual litigation of numerous cases would proceed. Individualized litigation would also present the potential for varying, inconsistent or contradictory judgments, and would magnify the delay and expense to all parties and to the court system resulting from multiple trials of the same factual issues.  By contrast, the maintenance of this action as a class action, with respect to some or all of the issues presented herein, presents few management difficulties, conserves the resources of the parties and of the court system and protects the rights of each member of the Class.  Plaintiff anticipates no difficulty in the management of this action as a class action.  Class-wide relief is essential to compliance with NYC BIIL.

## COUNT I

### Violations of New York City, N.Y., Code § 22-1202, *et seq.*

50.    Plaintiff incorporates the foregoing allegations as if fully set forth herein.

51.    NYC BIIL states that "[i]t shall be unlawful to sell, lease, trade, share in exchange for anything of value or otherwise profit from the transaction of biometric identifier information." New York City, N.Y., Code § 22-1202(b).

52.     Plaintiff and the Class are individuals who have had their "biometric identifier information" collected and/or captured by Defendant, through its Amazon One technology employed at the Amazon Go, Starbucks with Amazon Go, and Whole Foods locations, as explained in detail above.

53.     Plaintiff's and the Class's biometric identifiers were used to identify them and, therefore, constitute "biometric information" as defined by NYC BIIL. *See* § 22-1201.

54.     Defendant systematically and automatically sold, leased, traded, shared in exchange for anything of value or otherwise profited from the transaction of Plaintiff's biometric identifier information. § 22-1202(b).

55.     Specifically, Defendant profited from using TBAOs to (1) expand their database and/or improve their products/services; (2) galvanize individuals to create and/or utilize Amazon accounts; (3) automatically link individuals' biometrics with other forms of personal information (phone numbers, credit/debit cards, and purchase history) and gathering data therefrom; (4) increase the likelihood that. and frequency with which, customers consummate purchases; (5) hold out their database of biometrics/Amazon One as a product/service to other companies.

56.     Defendant did not provide proper notice to Plaintiff and the putative class.   NYC BIIL requires any "commercial establishment that collects, retains, converts, stores or shares biometric identifier information of customers must disclose such collection, retention, conversion, storage or sharing, as applicable, by placing a clear and conspicuous sign near all of the commercial establishment's customer entrances notifying customers in plain, simple language, in a form and manner prescribed by the commissioner of consumer and worker protection by rule, that customers' biometric identifier information is being collected, retained, converted, stored or

shared, as applicable." New York City, N.Y., Code § 22-1202(a). Defendant failed to comply with these BIIL mandates.

57. Under NYC BIIL, "the term 'commercial establishment' means a place of entertainment, a retail store, or a food and drink establishment." New York City, N.Y., Code § 22-1201.

58. The Amazon Go, Starbucks with Amazon Go, and Whole Foods locations at which Plaintiff and the Class had their biometric identifier information collected, retained, converted, stored, and/or shared were thus commercial establishments under NYC BIIL.

59. On behalf of himself and the Class, Plaintiff seeks: (1) declaratory relief; (2) injunctive and equitable relief as is necessary to protect the interests of Plaintiff and the Class by requiring Defendant to comply with NYC BIIL's requirements for the collection, captures, storage, use and dissemination of biometric identifiers and biometric information as described herein; (3) statutory damages of $5,000 for each intentional and/or reckless violation of New York City, N.Y., Code § 22-1202(b)  pursuant to New York City, N.Y., Code § 22-1203(3) or, in the alternative, statutory damages of $500 for each negligent violation of New York City, N.Y., Code § 22-1202(b) pursuant to New York City, N.Y., Code § 22-1203(2); and (4) reasonable attorneys' fees and costs, including expert witness fees and other litigation expenses pursuant to New York City, N.Y., Code § 22-1203(4).

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Richard McCall, on behalf of himself and the proposed Class, respectfully requests that this Court enter an Order:

      a.    For an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiff as representative of the Class and Plaintiff's attorneys as Class Counsel to represent the Class members;

b.      For an order declaring that Defendant's conduct violates the statutes referenced herein;

c.      For an order finding in favor of Plaintiff and the Class on all counts asserted herein;

d.      For compensatory, statutory, and punitive damages in amounts to be determined by the Court and/or jury;

e.      For prejudgment interest on all amounts awarded;

f.      For an order of restitution and all other forms of equitable monetary relief;

g.      For an order enjoining Defendant from continuing the illegal practices detailed herein and compelling Defendant to undertake a corrective advertising campaign; and

h.      For an order awarding Plaintiff and the Class their reasonable attorneys' fees and expenses and costs of suit.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues so triable.


Dated: February 2, 2023                    Respectfully submitted,

                                           **BURSOR & FISHER, P.A.**

                                           By:    */s/ Philip L. Fraietta*
                                                   Philip L. Fraietta

                                           Philip L. Fraietta
                                           Julian C. Diamond
                                           Matthew A. Girardi
                                           888 Seventh Avenue
                                           New York, NY 10019
                                           Tel:  (646) 837-7150
                                           Fax: (212) 989-9163
                                           E-Mail:  pfraietta@bursor.com
                                                    jdiamond@bursor.com
                                                    mgirardi@bursor.com

                                           *Attorneys for Plaintiff*